The first case on the docket for the afternoon is Case No. 4-15-0312, Advocate Health Care and Hospitals Corporation v. Michael S. Cardwell. Appearing for the appellant is Attorney Laura Castagna. Is that right? I'm sorry. Castagna. Okay, thank you. And for the appellee is Attorney Erica Harrell. All right. Counsel, are you ready to proceed? Ms. Castagna? May it please the Court. My name is Laura Castagna and I represent the appellant, Dr. Michael Cardwell, on this appeal. We are asking that this Court reverse the trial court's order granting summary judgment in favor of the hospital, vacate the judgment order, and remand for further proceedings. Because the trial court erred in its application of existing law when it found that there was no genuine issue of material fact as to the doctor's affirmative defense and counterclaim for fraud and inducement. And also that the trial court erred when it determined that no genuine issue of material fact remained as to the hospital's affirmative defense to the doctor's fraud and inducement claim, which was ratification. Now this case is about Broman's desire to transition its medical center in Normal, Illinois from a Level II center with enhanced capabilities. Now to pursue that endeavor, the State of Illinois required that the center be directed and supervised by a perinatologist. My client, Dr. Cardwell, a doctor with over 25 years of experience in maternal-fetal medicine met this qualification. Moreover, the doctor had previously directed the transition of perinatal centers at two other centers in the country and has served as the director of maternal-fetal medicine at every medical center where he worked since 1984. Now in 2007, the doctor and Broman entered into some contract negotiations. Specifically after a meeting with Dr. Higgins, who was the VP of Medical Affairs and Chief Operating Officer with my client, and per Dr. Higgins' request, the doctor sent correspondence regarding his financial requirements and issues regarding the proposed program. The doctor in his correspondence to Dr. Higgins wrote, my financial needs are these, either a guaranteed loan or a loan to be drawn upon that is forgiven after a number of years and a directorship of the maternal-fetal medicine. Now in December of 2007, the doctor was presented with the Recruitment Assistance Agreement, which is the contract that arises from this breach of contract claim. Dr. Higgins at that time represented to the doctor that the contract for the directorship was being drafted. Now with that understanding, the doctor signed the Recruitment Assistance Agreement. Under the terms of the Recruitment Assistance Agreement, the doctor would relocate his practice to normal and he would lead the development of the perinatal program. In exchange, he would receive a $450,000 income guarantee loan, so that would mean over a period of 12 months he would receive the sum of $450,000, which would be forgiven after working for 12 months in the amount of one-fifth plus the corresponding interest. Now in September of 2008, nine months after the doctor began his practice at Burl Med, he still had not received the contract for the directorship. So in September of 2008, the doctor wrote a letter to Mr. Hunt, who was the president of Burl Med and the CEO, as well as Dr. Higgins, who was the VP of Medical Affairs and COO, which was entitled Director of Maternal-Fetal Medicine Proposal. Now in that letter, the doctor... So is that significant that it was entitled Proposal? Does that require us to make an inference regarding whether or not your client thought that he was automatically going to be the director and whether or not there was ever any agreement on that? Well, we would suggest that if you look at the entirety of that letter, even though it was entitled Proposal, if you look at the letter, the doctor explains how over the course of the time at Burl Med, he was observing some of the issues that the hospital needed to address in order to develop this perinatal program. I have looked at the entire letter and it's very suggestive in nature. When I say suggestive, I'm saying proposal-like. You know, this is what I think we should do, this is what I'm asking that we do, not this is what we will do based on our agreement that I am the director. Okay. There's also, I don't know if you also saw in our response to the motion for summary judgment, we also have correspondence from another member of the hospital where they were discussing developing that program. It was Pat Jasko who, you know, before the contract was even entered, they had members from Burl Med who were discussing with Dr. Cardwell regarding development of this program. So although the doctor's letter is entitled Proposal, you know, this was from the very beginning. This was, he, the very recruitment assistance agreement says the doctor was recruited to lead the development of the perinatal program. So although it's considered Proposal, you know, it's entitled Proposal, from the very beginning the hospital was, you know, recruited Dr. Cardwell in order to develop the program. So it wasn't as, using the word Proposal is not exactly the word choice that should have been used in, that should have been used because from the very outset they chose Dr. Cardwell because of his qualifications and his experience in doing, transitioning other medical centers to other institutions. Now, Mr. Hunt did respond to that letter two weeks later, and he did commend the doctor's input on the program development, but ultimately concluded that the hospital could not enter into the agreement at that time. Fourteen months later, Roman merged with another entity and became Advocate Roman. The doctor worked until September of 2011 before he relocated his practice to Texas. The hospital never developed a perinatology program, nor did it transition its center from a level two to a level two with enhanced capabilities. Now, the doctor would never have signed the recruitment assistance agreement without a clear understanding that the perinatal program would be developed and that he would be appointed the director. And so at what point did the doctor complain that this agreement was supposed to be part of the original agreement, and, hey, this is unfair, I'm being wronged here? At what point did the doctor raise that other than in response to this suit? I would, well, he left before the end of the contract, obviously, and then he did file the counter record. There's no, there's nothing to support when the doctor actually had conversations with the hospital that, you know, fraud was involved in this recruitment assistance agreement. This perinatology program was subject to an application process and approval by the Department of Public Health, right? Yes. So that hadn't happened, there hadn't been approval given, application hadn't even been made, correct? I'm not sure when the application was made, it's not in the record. But still it was dependent on department approval. If it's dependent on some third party's approval, then can you say that this was an agreement that had been entered into as opposed to contemplation of some future event? I think what you're referring to is that case of Kunskill, which basically says you can't have actionable fraud whenever you rely upon third party's approval. And I think our case is different because the doctor was obviously the only qualified candidate in order to make this a level two perinatal center with enhanced capabilities. Also, in the Kunskill case, the issues that they referred to as the third party conduct were things such as development of a road to a shopping center, that the leases had all been fulfilled at the shopping center, and that certain commercial leases or certain stores would be in this mall, which is different from our case where if the hospital wanted this level two perinatal center with enhanced capabilities as the applicant, obviously they're the driving force. So although it did require IDPH approval, this is something that if the hospital really wanted it, they would pursue it to the end. But it's not necessarily going to follow that it would be granted, right? It was out of their control. It was ultimately in the control of the Department of Public Health, the third party. I agree. It does require IDPH approval. But I think it's also true that the hospital is the driving force behind that. So I guess my question is what difference does that make if you have a third party that will impact whether or not you can move forward on what you're trying to do? I'm sure they would do their best if they wanted to pursue it, but that doesn't change. I don't see how that changes the fact that you're relying on a third party to take some action before you can actually do what you're trying to do. I think the distinction between what happened in Kunskil and why they decided that you can't say that if it requires a third party's approval, then that's not actionable fraud. As opposed to our case where this is a hospital, they recruited the doctor in order to develop this center. They recruited him in order to direct and supervise this center. It does require IDPH approval, but the hospital is the one who's ultimately as the applicant. It's not like IDPH approaches the hospital and says, hey, would you like to be a Level 2 Enhanced Center? Whereas the different factors that the court found determinative in Kunskil were truly things sort of outside of their control, whether the road was going to be completed. That's not something that the mall would be the driving force behind. The other issue is in that particular case where the representation that it was fully leased at the time, that the mall was fully leased at the time, and that specific commercial businesses would be at this mall is completely different from the hospital in this case who has an application before the IDPH for approval of their hospital. So obviously what we've been talking about is the first element of fraud and the inducement, which requires that there's a false statement of material fact. I've already talked about Kunskil and why we have argued that it's distinguishable. The other case is Alt, which was cited by the hospital, and that's the case which says that promises of future intent are not actionable. Now in that case, the plaintiff was an employee and she was applying for a job, and the representation in that case was that another employee would be fired and that she would be reassigned their accounts. So in that case, the court said that promises of future intent are not actionable. And we would argue that's unlike our particular case, and I would again state it's because the doctor was uniquely qualified for this position. The recruitment assistance agreement says that he was recruited to lead the development of the perinatal program, which is completely unlike the misrepresentation in Alt where they said, you know, we're going to fire another employee and give you their accounts. But doesn't it boil down to the fact that when he signed the recruitment agreement, there was no agreement with respect to the center or his directorship, and that was just something that was represented that would take place in the future? I mean, I know you couch it in your brief in terms of, oh, it's being put together right now, but I think that's a misapplication. I mean, the bottom line is it wasn't ready at the time that he was going to take place in the future. So isn't that basically an unenforceable broken promise? I would just, my response is that at the time that Dr. Higgins gave him the recruitment assistance agreement, he said the contract for the directorship was being drafted. Now the doctor, even in the correspondence before he entered into the recruitment assistance agreement, the hospital knew from the very beginning that this was just not, you know, you come practice at the hospital and do perinatology. It was about he was going to be the director of the maternal fetal medicine program. So, you know, the hospital, the doctor did question whether when he was given the recruitment assistance agreement, where was the contract for the directorship. But when Dr. Higgins told him that the second contract was being drafted, the doctor did not want to question that. Because Dr. Higgins was the VP of medical affairs, he was the COO, he had been having conversations from the very beginning about But does that change the fact that it's about future conduct? I mean, you know, we can say shame on him for misrepresenting or the doctor shouldn't have relied on it, but does that change the analysis as to whether or not it's a future promise? I think, just because of the facts and circumstances of our case, make it different. Because the IDPH requires that this perinatal center be directed and supervised by a perinatologist. And Dr. Cardwell was the only qualified candidate. Now, you said that a couple times, so you mean he was the only qualified candidate in the area at that time. But obviously, I guess they could have searched and brought someone else in with the qualifications. They could, but going back to the recruitment assistance agreement, they even put in their contract that Dr. Cardwell, you know, he was going to lead it, not that he's going to be the director. Right. And I would just say he's the only qualified person. So unless they're going to start an entire new search for somebody with these qualifications, which as I understand it, not many doctors have these qualifications in the beginning. So they could have done that. But I would argue that why would they have started with Dr. Cardwell from the very beginning, get all of his input from the very beginning, and then just go with a different candidate? Which I don't think is clear from the record if there was other candidates. The other issue that has been raised about fraud and the inducement is whether the doctor's reliance on the representation was reasonable. So that's the fourth element of fraud and inducement. Now to establish relevance, the court will look to the character and qualities of each particular, of the particular plaintiff and the particular representation that was relied upon. Now reliance is a question of fact. So the hospital has argued that it was unreasonable for the doctor to rely on this purported promise of future conduct that had not been executed for a directorship of a program that did not exist. So first we would point to well-established law which states that one who intentionally deceives another is not to be heard to say, in defense of the charge of fraud, that the innocent party should not have trusted him. So I would say this is exactly what's happening here, is that they're saying, the hospital is arguing, well, it was unreasonable for the doctor to rely upon the fact that the second contract for the directorship was being a program. Well, again, I would argue the facts and circumstances of this case is that they started the negotiations with the doctor from the very beginning of, we're going to transition the medical center in normal Illinois from a level two perinatal center to a level two with enhanced capabilities. So they basically strung him along. And another issue that the hospital has argued makes the doctor's reliance unreasonable. Now, the integration clause does say, this agreement is the entire agreement and understanding of the parties and supersedes any and all agreements, verbal or otherwise, between or among the parties concerning this subject matter. So looking at the case law, the case law that they have cited, Borrella, we have argued that the same district appellate court later questioned whether that was even right to consider the integration clause whenever you're looking at a fraud inducement claim. And that's basically because the integration clause is a contract principle, and we have fraud in the inducement, which is tort. And so in this case of First Colonial, the court explained that the integration clause will not preclude a plaintiff from relying upon extrinsic evidence in order to establish a cause of action for fraud, since fraud arises from a matter extrinsic to the contract. So in light of the circumstances of this case, being that his reliance on the directorship was reasonable, he was the only qualified candidate, and he was recruited to develop the perinatology program at Roman, and the state of Illinois required that it be directed and supervised by a perinatologist. As for the hospital's affirmative defense of ratification, the trial court erred in grantee summary judgment because the hospital cannot establish a prima facie case of ratification. Now fraud in the inducement renders a contract voidable at the election of an innocent party. The innocent party may either rescind the contract or choose to waive the defect, ratify the contract, and enforce it. To establish a prima facie case of ratification, a party must, with full knowledge of the act, manifest an intent to abide by and be bound by the transaction and intend to abandon his right to recover damages as a result of the fraud. The party's intent is a question of fact. Now, in support of the hospital's motion for summary judgment as to its ratification of affirmative defense, they have cited the fact that the doctor accepted $450,000, the doctor's knowledge as of October 20, 2008, that the doctor was a member of the Board of Health and Human Services, and that the doctor remained at the hospital until September of 2011, a period of nearly three years. So in support of their argument, they also cite two cases, Borzellino and Golden. I would argue these two cases are distinguishable from ours because both of which involved settlement contracts. In Borzellino, in that case, the plaintiff had sued his former business partners after discovering a $250,000 settlement he had breached for a derivative suit was fraudulently induced. The plaintiff alleged during settlement negotiations with the defendant that the defendant represented their new corporation, the Limited Liability Corporation, had nothing to do with the former contract or the formal business arrangement. In that case, the jury did enter a verdict in favor of the plaintiff, which the defendant appealed, arguing that the plaintiff ratified the contract. Ms. Castagna, your time is up. You will have time in rebuttal. Thank you. All right. Thank you. Counsel. Good afternoon. May it please the Court. My name is Erica Harreld, and I represent the Applee Advocate Broman Medical Center, and I'll refer to them as the hospital for the purposes of brevity and clarity here this afternoon. At its core, this case is about an individual who does not dispute that he accepted a $450,000 loan, signed a promissory note promising to repay it, and then simply refused to repay it. Despite Dr. Cardwell's attempts to set forth reasons why he should not be required to repay it, the Circuit Court properly entered summary judgment in favor of the hospital, and its ruling should be affirmed for three key reasons. On the last point, or one of the last points that the opposing counsel was addressing, having to do with the trial court's grant of summary judgment on the affirmative defense, what was the point in the trial court entering summary judgment on that? It had already granted summary judgment to the hospital. The affirmative defense would only have been relevant to a summary judgment in favor of the hospital. The court, we filed our motion for summary judgment as to all of the issues, and so it was one hearing and one ruling, and the court just made that ruling as to all of the issues. You would agree that if we were to affirm the trial court's grant of summary judgment to the hospital, that the affirmative defense summary judgment would basically be moot? We would agree with that. All right. We think there are three key reasons to affirm the court's ruling in its entirety. First, Dr. Cardwell cannot show that he suffered any harm or detriment as a result of executing the assistance agreement, and harm or detriment is a necessary element of a fraud in the inducement counterclaim or affirmative defense. Second, Dr. Cardwell cannot show that any reliance on receiving the second purported directorship agreement was reasonable. Third, to the extent that the assistance agreement was procured through fraudulent inducement, the circuit court properly found that Dr. Cardwell ratified it. Starting first with the issue of harm or detrimental reliance, it's undisputed that no representation made by the hospital caused Dr. Cardwell to either resign from his prior position or to relocate to Bloomington. Before moving to Bloomington, Dr. Cardwell had been practicing at a hospital in Missouri and had hospital privileges there. It's undisputed that Dr. Cardwell resigned those privileges several months prior to ever beginning negotiations with the hospital. It's also undisputed that Dr. Cardwell moved to the Bloomington Normal Area for personal reasons, and he had planned to move there prior to ever meeting with any hospital. Dr. Cardwell also did not lose any opportunities as a result of signing the assistance agreement. The agreement into which the parties entered provided Dr. Cardwell with a $450,000 income guarantee loan. He could use the loan to pay for any expenses that he incurred while starting his practice there for the first year, and it ensured that he would have a certain amount of money. However, although Dr. Cardwell established privileges at the hospital and became a hospital staff, contractually he remained an independent contractor, and he was allowed to establish medical privileges at other local hospitals as well. Dr. Cardwell also had no obligation to give to the hospital any of the money that he earned during his private practice. Moreover, because the $450,000 was not a salary, but instead it was merely a loan, there was no ceiling on the amount of money that Dr. Cardwell could have earned during that first year or any subsequent years. It's also undisputed that Dr. Cardwell cannot identify a single opportunity that he forewent or any other offers that he declined when executing the assistance agreement. Indeed, if he did not want to continue practicing in the Bloomington Normal Area, he was free to relocate and leave. All he had to do was repay the money that he borrowed and the part that had not been forgiven. Simply put, being required to repay money that you admit you borrowed is not a harm, and Dr. Cardwell cannot demonstrate otherwise. Dr. Cardwell's arguments that he suffered damages are without merit. Dr. Cardwell is now arguing for the first time on appeal that he was damaged in the amount of $300,000 for five years. But notably, Dr. Cardwell does not allege that the hospital ever actually agreed to pay him $300,000 for five years. Moreover, he acknowledges that he was the one who proposed those terms nearly nine months after the assistance agreement was executed and after he had been practicing at the hospital. Notably, in his proposal, he doesn't reference any prior promises. He doesn't reference any prior agreements. He doesn't reference that these terms have ever been discussed with the parties prior. The fact that it's characterized as a proposal means this is Dr. Cardwell's offer of terms nearly nine months after he's been working and executed that assistance agreement. That the hospital did not agree to his offer does not constitute a compensable harm. Dr. Cardwell also is now arguing that he's at least entitled to nominal damages. But in order to have nominal damages, you first have to show an underlying harm or detriment that you suffered in the first place. And Dr. Cardwell cannot do that. Notably, Dr. Cardwell failed to raise either of these arguments for damages in either opposition to the motion for summary judgment or in his motion for reconsideration. Accordingly, we believe he should be found to have forfeited them on appeal because they were not properly presented before the trial court. This inability to show damages is fatal to the fraud and the inducement of counterclaim and affirmative defense. Dr. Cardwell also cannot show that any reliance on receiving a second directorship agreement was reasonable. Dr. Cardwell's contention is that when entering into the assistance agreement, he relied on the promise that a second contract for a directorship was being prepared and would be presented to him shortly after executing the assistance agreement. Even if this is taken as true, the record shows that any such reliance would not have been reasonable. First, it's undisputed that Dr. Cardwell knew prior to executing the assistance agreement that he and the hospital had not agreed on any of the material terms that would govern a directorship contract. It's also undisputed that Dr. Cardwell knew prior to executing the assistance agreement that he was not even going to receive the hospital's offer of those terms until executing the assistance agreement. Since Dr. Cardwell did not even know what the terms of the hospital was going to propose would be, there was no way he would know whether those terms would be acceptable to him. Indeed, at the time of signing, no legal contract for a directorship actually existed because the party did not agree to any of the essential terms that would govern such an agreement. At most, Dr. Cardwell is alleging an agreement to agree on future contracts, which has always been held unenforceable under Illinois law. The arguments that Dr. Cardwell sets forth to try to show that his purported reliance was justified are simply unavailing. Dr. Cardwell contends that he believed that as the hospital COO, Dr. Hagen was able to make representations on behalf of the hospital. And Dr. Cardwell has argued in his brief that he had no way of verifying whether Dr. Hagen's representations were true. Both of those arguments are of no legal consequence here because regardless of whether Dr. Cardwell believed Dr. Hagen had the ability to make representations on behalf of the hospital or regardless of whether Dr. Cardwell was in a position to be able to verify what Dr. Hagen was doing, Dr. Cardwell in fact knew prior to executing the assistance agreement that no terms had actually been agreed upon. So the notion that somehow there was actually a directorship contract that was being prepared is implausible because there have been no terms to which the parties agreed and Dr. Cardwell does not dispute that. And Illinois courts repeatedly have found that statements regarding future intent or future conduct are not actionable as fraud. Now I understand trying to characterize it as present tense of saying, well Dr. Hagen said he was presently working on a contract. That is misleading because the contract itself did not exist. At most what could be said was that Dr. Cardwell was working on a paper that would contain the hospital's offer of terms that would be presented to Dr. Cardwell. But Dr. Cardwell knew at the moment of signing that he had not received those terms. He had not agreed to those terms and there had been no specification of what the terms might entail. So it's unreasonable to say you were relying upon that as being important to your decision when executing the agreement. That's an independent basis for affirming the circuit court's entry of judgment. With respect to the fraud and the inducement counterclaim and affirmative defense, the circuit court properly found that Dr. Cardwell did ratify the assistance agreement. It's undisputed that Dr. Cardwell received a benefit from executing the assistance contract. He accepted the benefit of a $450,000 loan. He also accepted the benefit of a forgiveness of 40% of that loan plus the corresponding interest rate. It's important to note that the hospital did not sue Dr. Cardwell for the entire $450,000 loan. It was only the portion of the loan that remained unpaid and unforgiven. How was that calculated? I was having trouble figuring how they came up with the, it was going to be credited with two-fifths. Because he started in December of 2007 and I thought he didn't leave until 2011. From 2007 and 2008, that was called the guarantee period. So from my understanding, we have an affidavit submitted by Aaron Klein, the VP of finance for the hospital. And that money was paid out to Dr. Cardwell during that year. Then after, starting after approximately December of 2008, then the repayment period began. Okay, so it started then. Correct. And so his obligation to repay started at that point. Was he earning a salary on top of this loan? He was not earning a salary from the hospital. He was earning money from any private patients that he saw. And all of that money went directly to him and he had no obligation. And we don't, the record doesn't reflect whether he was practicing at other hospitals or not. But he was free to do so if that was something that he wanted to do. He fully accepted the benefits of that loan and the loan forgiveness and the interest. And at this point in time, Dr. Cardwell is claiming that he rescinded the agreement. That doesn't make sense based on these facts. Rescission requires putting the parties back into the place that they would have been prior to the execution of the agreement. If Dr. Cardwell had in fact rescinded this agreement, Dr. Cardwell would have needed to pay back the entirety of the loan. Nothing on the record reflects that Dr. Cardwell paid back the loan. In fact, it shows that he retained the benefit of that loan. And simply deciding that you're going to leave after accepting the benefit and not repaying it doesn't constitute rescission. It's simply garden variety breach of contract, which is why the circuit court entered judgment in favor of the hospital in the first place. As Dr. Cardwell has raised no arguments that would warrant reversing the circuit court's decision, the hospital is requesting that this court affirm the circuit court's judgment. All right. Thank you, counsel. Thank you. Ms. Costagna, rebuttal. Well, just briefly, as to the issue of ratification, the cases that they have cited, Borsellio and Golden, are distinguishable. And that's because each of those cases involves settlement agreements. In Borsellio, the court found what was determinative in that case was the district court did reverse and found that by retaining the $250,000 settlement from the prior suit alone may not be sufficient to find ratification, given that the plaintiff received the funds prior to learning of the alleged misrepresentation and filed his first lawsuit in 2000. However, because the plaintiff also does not seek to rescind the release, which would have released the claim of fraud, then he ratified the contract. So I argue that's distinguishable from our case because in our case, the doctor had received a full amount of $450,000 loan before he learned of the fraud. That's another issue in this case is when did the doctor learn of the fraud? The hospital argues that the doctor learned of the fraud after Mr. Hott responded to his letter in October of 2008. However, I would argue that you have to look at the doctor's intent and the fact that the hospital changed from being Broman to Advocate Broman. Now, in the interrogatories, what was the doctor's response as far as when he knew that they were not going to be offering him a directorship? I think it's the request to admit facts. Yes. And he did admit that in October of 2008 that he knew that he would not be given the directorship. However, I think there's still a question of fact because even in Mr. Hunt's response, he said, we're not able to enter into this agreement at this time. He never said, we're not developing a perinatal program at this hospital. We're never going to make you a director. But they didn't say, as we previously agreed, you will be the director and this is when we're getting started. No. I can agree with that. And I would also say even in Mr. Hunt's response to the doctor, he never said the terms of your directorship are unreasonable. He just said we can't enter into this agreement at this time. The other case that was cited was Golden, and that's another case where there was a settlement agreement. However, in that case the plaintiff had discovered of the fraud before he accepted the settlement amount and released his claim. And then even after doing that, he sued for fraud. And in that case, the court specifically explained you can't discover a fraud, accept the benefits of a contract, and then decide to sue for fraud. Which, again, in our case the doctor did not discover the fraud until after he had received the full amount of the $450,000 loan. So we would just argue that both of the cases that were cited by the hospital, Cilio and Golden, are distinguishable. And the fact that you can't determine a doctor's intent because it's a thing pointed to in this record where they can argue that the doctor's intent would be known. For these reasons, we would ask that the order granting summary judgment to the hospital be reversed, vacate the judgment order, and remand for further proceedings. I can answer any questions if you have some. I don't see any. Thank you. Thank you both. The case will be taken under advisement and a written decision shall issue.